GOVERNMENT OF THE VIRGIN ISLANDS and CYRIL E. KING, GOVERNOR OF THE VIRGIN ISLANDS, Plaintiffs

v.

ELEVENTH LEGISLATURE OF THE VIRGIN ISLANDS and SENATOR AND PRESIDENT OF THE LEGISLATURE, ELMO D. ROEBUCK, ET AL., Defendants

Civil No. 75-474

District Court of the Virgin Islands

Div. of St. Thomas & St. John

April 21, 1976

54

VERNE A. HODGE, ESQ., Attorney General of the Virgin Islands, St. Thomas, V.I., *for plaintiff*

ALFRED L. SCANLAN, ESQ. (JOHN TOWNSEND RICH), Washington, D.C., ALEXANDER A. FARRELLY, ESQ., (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I., ATTY.

Maria Tankenson Hodge, St. Thomas, V.I., *for defendants*

Bornn, Finucan & Bruno (Edith L. Bornn, of counsel), St. Thomas, V.I., *amicus curiae*

CHRISTIAN, *Chief Judge*

### OPINION

This cause found its way before the Court initially on a complaint brought by the Government of the Virgin Islands and Cyril E. King, Governor of the Virgin Islands, as Plaintiffs. Named as Defendants are the Eleventh Legislature of the Virgin Islands, the President of that body, members of the Legislature in various capacities, and the Executive Secretary of the Legislature.

In their first cause of action of the two-count verified complaint the Plaintiffs sought injunctive relief, as well as a judgment declaring the duties, rights and relationship of the opposing parties vis-a-vis section 9(d) of the Revised Organic Act of the Virgin Islands.

Similar relief is sought in the second cause of action. There, however, the Plaintiffs challenge the validity of an enactment of the Legislature, Bill No. 6784, which the Governor had vetoed and returned to the Legislature with his message of disapproval. Acting pursuant to its recognized authority, the Legislature overrode the Governor's veto and the bill became law as Act No. 3718. Claiming that the Act impermissibly trenches on executive powers, the Governor has prosecuted the cause of action stated in Count II of the complaint.

The Defendants, in addition to denying the material allegations on each of the two counts pleaded by the Plaintiffs, have launched a two-pronged attack of their own, in the first count of which they challenge the validity of several items vetoed by the Governor of various seg-

ments of several appropriations bills. While Defendants do not deny that the item veto power reposes in the Chief Executive, they vigorously assert that he has invalidly attempted its exercise in these instances. In the second count of their counterclaim Defendants seek a declaratory judgment to the effect that the Governor proposes to impound funds appropriated by and to the Legislature in Bill No. 6762 (Act No. 3709), and that any such impoundment would be an unlawful undertaking, the Chief Executive being wholly powerless so to do.

■ Plaintiffs' first cause of action, to which we now return, has already been decided by this Court, a decision now on appeal before the United States Court of Appeals for the Third Circuit. We there held that under section 9(d) of the Revised Organic Act, properly construed, the Legislature is completely without authority to override an item veto of the Governor. Since making that judgment, and in connection with the resolution of the remaining disputes between these parties, the Court has found what it conceives to be additional buttressing for its ruling in the provisions of the numerous state constitutions examined by the Court in which the state governors are granted the item veto power. Without exception those state constitutions provide in language, taking one form or another, that the item veto of the Governor may be overridden by the Legislature in the same manner as his general veto of an entire bill.[1] This circumstance besides lending support to the Court's earlier ruling takes on added significance with respect to some of the issues yet to be decided in this cause. Clearly the Congress of the United States in legislating section 9(d) of the Organic Act of this territory must be deemed to have been fully aware of

[1] See for example Green v. Rawls (Fla.); Commonwealth v. Barnett (Pa.); Fairfield v. Foster (Ariz.); Fulmore v. Lane (Tex.); State v. Henry (Wis.); Sego v. Kirkpatrick (N.M.); In re Opinion of the Justices (Mass.), cited infra, to mention but a representative few.

the many state constitutional provisions permitting the override of an item veto. By using language which unmistakably, in our view, withheld such power from the Legislature of this territory, the Congress must be taken to have, with deliberate intent, decreed that for reasons best known to itself this was the situation it desired for this territory at that time. In so doing the Congress has, with a strong degree of certainty, it seems to us, placed the Chief Executive of this territory at an advantage over the supposedly co-equal branch, the Legislature, a circumstance which we constantly must bear in mind as we sift through issues raised by pleadings of these parties, and discussed in their briefs.

■ Threshold questions were raised by the Defendants but hardly pressed in their written arguments. Perhaps, sub silentio, this is a concession on their part that Plaintiffs' position is worthy of full merit. These questions raised by Defendants to which I have adverted, contest the propriety of the Government of the Virgin Islands as a party plaintiff, the Governor of the Virgin Islands as a party plaintiff, and the standing of the latter to maintain this suit. We deal quite briefly with these arguments and hold that for the various reasons stated in the briefs of the Plaintiffs the motions to dismiss on those asserted grounds must be and are denied.

■■ Putting aside case authority which supports the Governor as a party plaintiff, he could, at a minimum properly maintain this suit in this jurisdiction as a taxpayer. Defendants, in their contention that the Government of the Virgin Islands is not a proper party, seem to say that the Governor lacks the authority to bring a suit in the name of the Government of the Virgin Islands. In disposing of this assertion, suffice to say that the Attorney General of the Virgin Islands, a member of the Governor's cabinet, whose name is subscribed to the

60

complaint, manifestly has the authority to bring such a suit in the name of the Government of the Virgin Islands. We have already so held (see discussion of this matter in Memorandum Opinion, Government of the Virgin Islands, et al. v. Puerto Rican Cars, Inc., Civil No. 52/1970, filed February 8, 1971, pages 6–14).

At the outset it seems appropriate to set out in its entirety section 9(d) of the Revised Organic Act of the Virgin Islands.

Every bill passed by the legislature shall, before it becomes a law, be presented to the Governor. If the Governor approves the bill, he shall sign it. If the Governor disapproves the bill, he shall, except as hereinafter provided, return it, with his objections, to the legislature within ten days (Sundays excepted) after it shall have been presented to him. If the Governor does not return the bill within such period, it shall be a law in like manner as if he had signed it, unless the legislature by adjournment prevents its return, in which case it shall be a law if signed by the Governor within thirty days after it shall have been presented to him; otherwise it shall not be a law. When a bill is returned by the Governor to the legislature with his objections, the legislature shall enter his objections at large on its journal and, upon motion of a member of the legislature, proceed to reconsider the bill. If, after such reconsideration, two-thirds of all the members of the legislature pass the bill, it shall be a law. If any bill presented to the Governor contains several items of appropriations of money, he may object to one or more of such items, or any part or parts, portion or portions thereof, [while approving] the other items, parts, or portions of the bill. In such a case he shall append to the bill, at the time of signing it, a statement of the items, or parts or portions thereof, to which he objects, and the items, or parts or portions thereof, so objected to shall not take effect.

We are first confronted, then, with the proper interpretation of the last two sentences of that section. The matter is one of the first impression in this jurisdiction and we are therefore left at sea insofar as local precedent is concerned. Item veto language is not at all uncommon as we have seen. It fairly abounds in state constitutions, as it

did, and still does, in the basic laws of past and present territories of the United States, as well. None of those, however, which have been construed by the highest courts having jurisdiction, insofar as our research has revealed, are couched in precisely the same language as is our section 9(d). Consequently, resort to such sources, while of some persuasive force, offer no ineluctable guide, nor can they be considered as fast binding precedental authority. By way of illustration, we mention briefly two or three of the item veto provisions which have been urged on us in various contexts by one side or the other as controlling on certain of the issues. In re Opinion of the Justices, 2 N.E.2d 789 (1936) called upon the Supreme Judicial Court of Massachusetts to resolve similar issues. The article of the Massachusetts constitution there under consideration provided only that

[t]he Governor may disapprove or reduce items or parts of items in any bill appropriating money. . . .

Restricted to language so clear, the result reached by that court was predictable.

State ex rel. Cason v. Bond, 495 S.W.2d 385 (Mo. 1973), like In re Opinion of the Justices, construed language in a manner which, it is urged, is determinative of the issues before this court. Here too, however, the wording of the Missouri constitution deprives that case of governing influence, for the authority of the Governor was simply "to veto all or part of any item of money in an appropriation bill".

Sego v. Kirkpatrick, 524 P.2d 975 (Sup. Ct. N.M. 1974), repeats the same situation, and is a holding which on its face appears commanding. This conclusion likewise is shaken by an examination of the New Mexico constitutional provision which provided no more than that "the Governor may . . . approve or disapprove any part, or parts, item or items, of any bill appropriating money."

A final example and closer to home is Blanch, et al. v. Cordero, 180 F.2d 856 (1st Cir. 1950). In Blanch the Organic Act of Puerto Rico, which as of the time in question was being interpreted, read, "If any bill presented to the Governor contains several items of appropriation of money, he may object to one or more of such items, or any part or parts, portion or portions thereof, while approving the other portion of the bill."[2]

In the situation in which we find ourselves, we can only seek out those cases most nearly in point because the constitutional provisions interpreted approximate our basic law, and choose, perhaps somewhat at random, from the best reasoned of the cases. However, we bear constantly in mind the territorial status of the Virgin Islands as against that of a sovereign state, never overlooking the fact that such powers, as may be found to be possessed by any of our three branches of government, must be found within the four corners of our Revised Organic Act. What the Congress has failed to give, this Court is impotent to award, and where as sometimes seems to be the case, the Congress has spoken more by oracular pronouncement than clear and adept legislative drafting, we can do no more than hazard our best guess at the true intent of the Congress.

By way of foundation for what follows we make mention of the motivating purpose which brought forth the item veto provision.

In the early struggles between the Legislature and the executive branches, particularly where there was no

---

[2] Also to be contrasted with the Virgin Islands section 9(d) are: Turner v. State H'way Commission, 186 N.W.2d 141 (Iowa 1971); Patterson v. Dempsey, 207 A.2d 739 (Conn. 1965); Brown v. Ferguson, 291 N.E.2d 434 (Ohio 1972), by no means an exhaustive list.

prescribed limit to the number of subjects which the Legislature might include in a single act, a practice developed that came to be known as "log-rolling". In this pernicious pursuit, the legislative branch was able to bind the executive in a virtual straight jacket by combining in a single bill, legislation of highest importance and desirability to and by the people with other matters totally devoid of redeeming grace, except as it might benefit an individual politician or some small and favored segment of the population. The net result was to present the Governor with a decidedly vicious "Hobson's Choice". In order to obtain the important, the constructive, the desired, he had to accept the unwanted and harmful portions, restricted as he was to either veto of an entire enactment or to its approval in toto. In the nature of things, "log-rolling" was employed where money was being appropriated. Thus it was that state constitutions, one after another, sought to overcome this evil either by provision limiting bills to a single subject or by providing for item veto in appropriation bills or by a combination of both. Significantly, the Legislature of this territory is in no way bound by a provision in our Organic Act (or local legislation) which mandates that each law enacted by the legislature embrace but one subject and matters properly related to that subject. It is a moral certainty that when the Congress replaced our Organic Act of 1936 with the Revised Organic Act of 1954, the curbing of this type of evil[3] was uppermost in its mind despite the fact that the 1954 Act was loudly proclaimed as one granting additional autonomy to the territory, which in some respects it did.

---

[3] For a more explicit and learned treatment of the subject see, Patterson v. Dempsey, supra, footnote 2, at p. 746; Commonwealth v. Barnett, 48 A. 976, 977 (Pa. 1901); State v. Holder, 23 S. 643, 644 (Miss. 1898); Caldwell v. Meskill, 320 A.2d 788, 792 (Conn. 1973).

Restrictions tightening the reins, absent in the 1936 Act, were very much in evidence, in the 1954 version.[4]

Merely as a matter of convenient choice, we address first, Count I of the counterclaim interposed by Defendants.

## THE LEGISLATIVE APPROPRIATION MEASURE

The Legislature on January 27, 1975, duly passed Bill No. 6762, an Act "To Fix the Regular Expenses of the Legislature of the Virgin Islands for the Fiscal Year July 1, 1975 to June 30, 1976 and for Other Purposes." The bill consisted of a single section with five subsections at the end of which there was a total appropriation of $2,309,214. Each of the five subsections contained what Defendants characterize as "purpose language". Subsection (b) provided in part for ". . . all necessary expenses for the operation of the legislature and its post audit division as established by Act 3661." Subsection (e) in its entirety read "Grant to the Office of the Virgin Islands Delegate". The Governor undertook to exercise what he views to be the item veto power given him pursuant to section 9(d), by striking from subsection (b) the words "and its post audit division as established by Act No. 3661" and by deleting the entire subsection (e). In so doing the Governor contends that he was properly vetoing part of an item of appropriation of money. Not so, say Defendants. Bill No. 6762, they go on, is but one single item of appropriation of money. Section 9(d), they continue, empowers the executive to veto an item or part of an item only if the measure contains several items of

[4] Whereas the 1936 Act provided for a legislative override of the item veto, the 1954 Act did not. Prior to the 1954 Act it seems special sessions could be called by the legislative body. With the advent of the Revised Act, only the Governor could do so. The power of the legislators to fix their expenses and reasonable compensation under the 1936 Act was taken away, and in another important instance the 1954 Act strictly limited the regular session of the legislature.

appropriation of money. Since the bill itself, as they read it, is but one item of appropriation, the item veto provision is not triggered, declare Defendants. Responding, Plaintiffs contend that each of the five subsections is part of an item appropriating money. There are therefore, say Plaintiffs, several items contained in this bill, and they conclude that parts of two of those items were properly vetoed.

■ Since the Defendants are eminently correct in saying that if there is but one item of appropriation of money in a bill, such a measure is immune to the item veto, a look at what is meant by "item" and "item of appropriation of money" is warranted.

■ Several of the cases cited above, as well as in the margin, have dealt with the troubling words and phrases in question. An item to the Defendants means "a distinct amount of money dedicated to a specific purpose or set of purposes." Supporting the proposition that an item includes both a stated sum of money and a purpose is a goodly body of respectable authority. Bengzon v. Secretary of Justice, 299 U.S. 410 (1936); Caldwell v. Meskill, 320 A.2d 788 (Conn. 1973); Patterson v. Dempsey, supra; Green v. Rawls, 122 So.2d 10 (Fla. 1960); Commonwealth v. Dodson, 11 S.E.2d 120 (Va. 1940); and Black and White Taxicab Co. v. Standard Oil, 218 P. 139 (Ariz. 1923). Were we to accept Defendants' as the hard and fast definition, the tide would certainly flow in favor of Defendants. There is, however, authority of different persuasion to whom an item need not incorporate a specific sum. See State ex rel. Brown v. Ferguson, 291 N.E.2d 434, 438 (Ohio 1972); Commonwealth v. Barnett, supra, 48 A. 976 (Pa. 1901). Speaking of this question, the court in Brown v. Ferguson observed

that those provisions in an appropriation bill which are separate and distinct from other provisions in the same bill, insofar as the

subject, purpose, *or* amount of appropriation is concerned, are items within the meaning of Section 16, Article II of the Ohio Constitution. At p. 438. (Emphasis added.)

The Virgin Islands Code commands that,

Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the English language. Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning. 1 V.I.C. § 42.

Taking "the common and approved usage" from Webster's Third New International Dictionary, Unabridged 1966 Edition, an item is

an individual, particular or detailed, singled out from a group of related particulars or detail . . . singled out from an aggregate of individual things (as those being enumerated in a bill or inventory or similar list) . . . something singled out from a specified or implied category of things of the same kind.

On our consideration of the various definitions, we can, with consistence, make common cause with both sides. For us an item may combine purpose and specific monetary amount but in some contexts need only state subject or purpose or amount. Instructed in any of the suggested schools of thought, we are inclined to the same result with respect to the veto of Bill No. 6762.

About the limits of the power which the item veto entails, a passing word.

It is beyond question that in exercising the veto, a Chief Executive is exercising functions that strongly partake of the legislative. Especially is this true of the item veto. Fitzsimmons v. Leon, 1414 F.2d 886, 888 (1st Cir. 1944); Cason v. Bond, supra; State v. Henry, 260 N.W. 486, 492 (Wis. 1935); Fulmore v. Lane, 140 S.W. 405, 411 (Tex. 1911); Commonwealth v. Barnett, supra; State v. Holder, 23 So. 643, 645 (Miss. 1898). Of the same general

acceptance is the understanding that in essence this legislative mission of the executive must remain a negative, rather than a creative function. Uniformly, courts have not hesitated to express disapproval of obvious attempts to distort legislative purpose or intent in appropriation measures by the selective deletion of particular words, phrases or sentences. In these disputes, a constant care of the judiciary has been to see to it that chief executives do not invade the legislative domain under the guise of the item veto power. For this reason, and justifiably, there is a wealth of strong sentiment that would have the item veto power strictly construed. Cason v. Bond, supra, at p. 392.

Directing attention then once again to Bill No. 6762, decision would be facile were the Court to accept the definition of an item as a distinct amount of money dedicated to a specified purpose, or set of purposes, and at the same time, go on to hold that the sum stated at the end of Bill No. 6762 is the quantitative aspect of a single item. In that setting, the Governor would have been faced with the problem of either accepting the bill as a whole or vetoing the same in its entirety. Thus, the Legislature either by inadvertent failure to allocate specific amounts to separately enumerated purposes, or by wilful design so intending, would be able to effectively nullify the item veto power of the Executive.

As we perceive the bill, not only is each section thereof a part of an item, but there are sub-items within some of those items. The lack of specific sums set off against each of the individual purposes stated in the bill in no way changes its effect or its nature as a bill authorizing the expenditure of the government moneys for specific objects, projects, or intentions. We observe, if only in passing, and whether it be significant or simply common drafting technique, the very title of this bill would seem to belie the contention that

it was but a single item of appropriation for it recites, after having adverted to the fixing of the regular expenses of the Legislature, the words "and for other purposes". Certainly money appropriated for compensation for members of the Legislature is dedicated to a different purpose than money set aside for salaries of regular or temporary employees, or for FICA and retirement contributions, or for equipment, or for maintenance and general expenses. Were this attempt to succeed, the Legislature could, by making a lump sum appropriation in all cases, render the item veto provision of section 9(d) of our basic law as functional a device as is one's vermiform appendix.

If the Legislature, by putting purpose, subject, and amount inseparably together, and calling them an "item", can coerce the governor to approve the whole or none, then the old evil [logrolling] is revived which [the item veto power] was intended to destroy.

Commonwealth v. Barnett, at p. 978.

■ The Legislature's inclusion of the provision for its post audit division is an ideal case in point. Previously the Legislature had enacted Bill No. 6614 to provide for a post audit division and had appropriated the sum of $50,000 for that office. By message dated March 5, 1975, the Governor vetoed Bill No. 6614. It is a fair assumption that his veto was not overridden. Either no attempt was made to override, or if attempted was unsuccessful. The all too obvious plan of the Legislature in Bill No. 6762 was to slip the same office past the Governor, masquerading it under the guise of this single item appropriation bill, thus compelling the Governor to accept the unwanted and perhaps unwholesome with the beneficial and needful, or to have none at all. It was precisely to combat this type of legislative deviousness that the item veto was born. Just as the Governor may not legislate creatively by selectively

excising words, phrases and/or sentences from duly enacted legislation so as to distort, frustrate or defeat the overriding legislative intent, the Legislature, by the same token, may not avoid, hamper or abridge the Governor's item veto power by the ingenious drafting of appropriation bills wherein separate and distinct items of appropriation sail onto the rolls "under false colors". We hold that the Governor may, with his item veto scalpel, appropriately sever what he considers to be malignancies from the healthy tissue of Bill No. 6762. We conclude that he properly exercised the item veto in each of two instances of which Defendants complain.

We, of course, recognize the existence of language in Fulmore, supra, and other cases of that ilk, which might indicate that the result should be other than that which this Court has reached. The Texas Supreme Court opted for the consideration that, where only the single sum of money was specified but one item was listed, it had to be either approved or disapproved as a whole. Dealing with what appears to have been a lump sum appropriation with numerous "purposes", that court expressed itself in the following language:

The appropriation for the Attorney General's Department . . . does not itemize the appropriation or apportion the same as in other cases, but enumerates the various purposes for which the aggregate sum of $83,160 may be expended under the discretion of the Attorney General.

We are in no way persuaded to follow the reasoning of the Fulmore court. We think a comparison of the two enabling provisions are so vastly different that similar holdings need not, indeed, ought not to follow. To set out the similarity as well as the dissimilarity between the Texas item veto provision and ours, we print in the margin the pertinent provision of section 9(d) of the Revised Organic Act with underscoring and bracketed addi-

tion to indicate the likenesses, as well as the differences of the two provisions.[5] The added breadth of the Virgin Islands Organic Act is patent. The Texas constitutional provision predated our 1954 Act. The Congress legislating with the knowledge, which must be attributed to it, of the Texas constitutional provision, must have intended some different effect and result as a consequence of the additional words used. Thus are we turned away from the Fulmore language quoted above.[6]

■ The argument may be made, and not without substantial merit, that the Governor, having removed the objectionable part of these two items, should have, in some amount, reduced the overall appropriation. Well it might be that this would have been the wiser procedure for him to have followed. This court, however, sits not to judge the wisdom of either of the two other branches of this Government but rather to deal only with the legality of their actions when challenge to their doings is properly presented. Indeed, in the case of the post audit division, the Governor might have reduced the overall expenditure by $50,000, that being the sum which the Legislature had appropriated for that division in the ill-fated Bill No. 6414. Perhaps too, by an examination of previous legislative budgets, the Governor could have arrived at a

---

[5] *If any bill presented to the Governor contains several items of appropriations* of money, *he may object to one or more of such items,* or any part or parts, portion or portions thereof, while approving [and approve] *the other* items, part, or *portions of the bill.* (The words emphasized are as they are contained in the Texas Constitution. The words in brackets are substituted in the Texas Constitution for the two words "while approving" which immediately precede the bracketed words.)

[6] Our holding that the Governor has properly exercised his item veto with respect to the words "and its post audit division" and "Grant to the Virgin Islands Delegate" given its proper effect, will bar the Legislature from emasculating the item veto provision which result one is bound to conclude the Congress deliberately intended by the Revised Organic Act. We venture the opinion that, at the same time, it may well deprive the Congress of what it might view as cause for visiting this Government, through our basic law, with an even more iniquitous imposition, something that body has, in times past, at least, been prone to do.

reasonable figure by which he could have reduced the overall total, after having cut out the provision for the Virgin Islands Delegate to Congress. We do not regard the Governor's failure to do so of sufficient consequence to nullify his veto. He has a right to rely on the assumption that the Legislature will act responsibly and not squander the excess funds. In any event, there seems to be built into this appropriation bill, as appears to be the practice here and elsewhere, a state of affairs in which it is contemplated that the Legislature would not necessarily utilize all of the total sum appropriated, for section 1 of the Bill reads, in part,

[t]he following sum, or so much thereof, as may be necessary, is hereby appropriated,

clearly saying to this Court that an unexpended balance at the end of the fiscal year was always a designed possibility. The failure of the Governor to reduce the lump sum then, in no way altered what seems to be a calculated overplus of funds.

The Legislature is hardly in a position to contend that any harm was done to it by the Governor's failure to reduce the lump sum appropriation. This is not an instance in which the Governor has cut away the "purpose language", so called, from the budget of one of his executive departments and in which it may be argued that since he has not reduced the total sum, he will have this added sum of money to be spent willy nilly as he, in his unbridled discretion, might see fit. Whatever excess of funds may result from the upholding of this item veto by the Governor will be left under the sole control of the beneficiary for which it had been intended in the first place. That beneficiary, in this case the Legislature, will, of course be expected, as we have pointed out, to act responsibly, and not prorate the overplus among its other legis-

lative purposes, but rather leave it at the end of the fiscal year uncommitted and unexpended.

A further reason we are persuaded that the failure of the Governor to reduce the lump sum appropriation of Bill No. 6762 is not fatal stems from the fact that in several other instances in which the Governor vetoed items or sub-items but failed to reduce the lump sum appropriation to the department in question, those vetoes, as Defendants admit, were not challenged on any ground, therefore apparently conceding the validity of the practice.[7]

Two other item vetoes of the Governor which Defendants challenge occur to us to be, in their nature, related to those vetoes of the portion of Bill No. 6762, which we have just explored. They are (1) the veto of that portion of section 1.H.5. of Bill No. 6764 (Act No. 3710) which read

. . . including one additional veterinary technician, St. Thomas

and (2) the language in section 1 of Bill No. 6765 (Act No. 3711)

. . . including study leave for one employee . . . .

In view of our holding with respect to Bill No. 6762, and what we deem to be the undergirding support for that holding, we reach a like conclusion with regard to the immediately above-mentioned two vetoes of the parts of Bill Nos. 6764 and 6765. We uphold both as valid executive action.

THE GENERAL APPROPRIATIONS BILL

The scene of the struggle shifts to the battleground of Bill No. 6764, which provided appropria-

---

[7] See for example Bill No. 6764 in section (C) where an item for the Department of Education with an appropriation of $39,777 was item vetoed yet the overall appropriation for that department was maintained. The same holds in the following section where $24,900 was item vetoed from the Department of Public Works without a reduction of the lump sum. In this regard, see generally the Governor's veto message on Bill No. 6764 dated July 7, 1975, which was attached to the Plaintiff's complaint.

tions for the operation of the Government of the Virgin Islands for the fiscal year July 1, 1975, to June 30, 1976. Unquestionably the bill was one containing several items of appropriations. Wherever entire items were vetoed by the Governor no question is raised. What spawns the controversy is the deletion by the Governor in the purported exercise of his item veto power, of certain language contained in several sections of the bill. As to the items so treated by the Governor, the Legislature insists that he could do no more than approve or disapprove them in their entirety. Such is not the Chief Executive's interpretation of his power, however, for he claims that he has done no more than veto parts or portions which, he claims, he is privileged to do. Were the issue solely whether or not the words "part or parts, portion or portions" refer to items or rather to the bill itself, resolution of the conflict would, in the view we take of the language, present no difficulty. Our reading of section 9(d) convinces us that "part or parts, portion or portions" refers in one segment of the section to the items, whereas in another the reference is to the bill itself. Consistent with that interpretation then, we hold that the power of the Governor extends to deletion of parts or portions of a bill which contains items of appropriation. We note, incidentally, that many of the constitutional provisions are pitched in terms of a grant of item veto to the executive branch if an "appropriation bill" is under consideration. To us the Virgin Islands basic law goes well beyond this, giving the item veto power to the Governor in the case of "any bill", whether or not it may be characterized as an appropriation measure, so long as included within that bill there are items of appropriations of money. Consequently, we cannot hold with Defendants that the Governor is powerless to strike language as such. At the same time it must be recognized that the authority

74

of the Governor to exercise the item veto is not one of untrammeled power. We have already made the point, we believe, that he may not so emasculate a piece of legislation as to produce a result totally at war with the legislative purpose. Particularly must this be the case when, as we have ruled, the Governor's item veto may not be subjected to a legislative override.

Dealing with the specific instances, we find that in each of the items in which the words "appropriation pursuant to section 15 of Bill No. 6784" appears, the Governor struck all but the word "appropriation", leaving the dollar figure intact. In another instance, where the Legislature had made an appropriation, in the words "Equipment purchase fund pursuant to Bill No. 6784", only the word "Equipment" of that language remained after the Governor's veto. Similarly with respect to another appropriation, the Legislature had provided: "to be expended in accordance with individual operating budgets for each major activity for the islands of St. Thomas, St. John and St. Croix, as approved by the Governor and the Legislative Committee on Finance." All of that language was vetoed out of the bill.

The above-mentioned vetoed language in each case, as the Defendants see it, constituted "conditions" or "restrictions" on the particular appropriation and they contend that as such it fell outside of the scope of the Governor's item veto power. Plaintiffs, on the other hand, advance three contentions in support of the executive action. Firstly, they say the Governor's acts in these regards are justified by the special authority which rests in his hands as a territorial Governor. Secondly, they urge that the excised language was readily separable, and its deletion worked no change in the meaning or purpose of the appropriation. Thirdly, say Plaintiffs, the so-called conditional language is clearly illegal, and it is well within the

75

Governor's power to exercise his veto by striking such invalid clauses.

 Speaking first to the claimed special authority of the Governor because of our territorial status, we admit the existence of that peculiar authority. We recognize too the basic differences between the governor of a sovereign state and that of this dependency of the United States. Indeed, by our ruling on Count I of Plaintiff's complaint special power is acknowledged. Granted that some extraordinary power does exist, we are nonetheless constrained to conclude that the conceded power has its limits, and, in the absence of the clearest of grants, should not receive this Court's seal of approval where it is clearly inconsistent with increased autonomy given the people of the Virgin Islands in the form of their duly elected legislative representatives. We hold, therefore, that the claim of so extensive a special power must fall.

 As to the argument asserting the separability of the conditional language, and that upon the elimination of that verbiage a complete, entire and workable law remains, that too cannot stand. The language, though excisable from a grammatical point of view, was, we take it, promulgated as an integral part of an appropriation, without which the clear intention of the Legislature would be violated. We conclude that such language cannot, with propriety, be struck down by the Governor at his unrestrained will.

The proposition that the Governor may strike unconstitutional or otherwise unlawful language from a legislative enactment is not entirely without decisional support. In Commonwealth v. Dodson, supra, a case in point, it was stated,

[o]f course, if for any reason any item may be unconstitutional, it may be stricken out, for it would be futile to require the Keeper of the Rolls to transcribe it thereon.

76

Perhaps, however, that language should be strictly circumscribed. If limited to the striking of an entire item deemed unconstitutional, either side, we are confident, would not quarrel with the doctrine.

 Another case, Commonwealth v. Barnett, supra, by implication, at least, would uphold the Plaintiff's contention for there the court summarily outdid the Dodson court saying,

Whether the proposed law is necessary or expedient, *whether it is constitutional,* whether it is so framed as to accomplish its intent . . . are questions transferred from the two houses to . . . [the executive], with the bill itself.

* * *

Suppose . . . that, instead of the beneficiaries being worthy public institutions, the city . . . had been directed to pay part of its appropriation to a sectarian school, in violation of the express prohibition in [the state constitution]. It would have been the Governor's imperative duty to veto such appropriation and the legislature could not coerce him by putting him to the alternative of approving it or disapproving the entire section . . . .

(Emphasis added.) Id., at 978. Contra, Patterson v. Dempsey, supra, at 749. We are not inclined to follow the lead of those two cases, however. Prompted perhaps by jealous self-interest, we hold in this regard, that the intention of the Congress to give the Governor unhindered powers, executive, legislative and judicial as well, is not so unmistakeably laid bare in the language of the Organic Act as to require this Court to sustain the claim to so far-reaching and wide-ranging a power. As to all of these attempts at the item veto, we conclude that the proper course for the Governor to have followed would have been a veto of the item in toto, language and money, leaving it to the Legislature thereafter to determine what legal avenues it would follow. Failing that drastic course, the Governor might properly have allowed the provision to become law

77

and mounted his challenge in the courts when the attempt to apply the law was made.

▮▮▮ Again, where in Bill No. 6767 at sections which read "with the approval of the Finance Committee of the Legislature" the Governor eliminated those words, we fear that he has once more exceeded his authority. We reiterate that in such instances he is forced to take his chances by either striking the entire item, or, having left it intact, to proceed to attempt expenditures without approval and await the challenge to such act, or if appropriate to seek a declaratory judgment as˙ to the validity of the provision.

## THE GENERAL LEGISLATION VETOES

Other, and we believe far more complex questions remain to be answered. The Governor deleted in some instances language that may not, by any means, be deemed items of appropriations or parts of such items. The precise language in each case is set out in the margin.[8]

---

[8] Section F.7. The sums transferred to the Department of Property and Procurement from various departments for operation of a central transportation service and deposited in the Transportation Fund herein shall be reallocated by the Governor to enable said departments to retain their own personnel and to make appropriate expenditures at a rate approximating the level of expenditures for such purposes made during the preceding fiscal year.

Section 2(b). The Governor is hereby authorized and requested to reopen negotiations with recognized government employee organizations with whom the Government of the Virgin Islands has entered into contracts of employment affecting salaries or compensation to be paid to member employees during fiscal year 1976, in order that certain amendments to those contracts might be effected in view of the current fiscal emergency.

Section 3. Notwithstanding any other provision of law to the contrary, the maximum amount which may be refunded or credited from the Reserve for Internal Revenue Tax refunds established pursuant to Title 33, Section 1102(b), Virgin Islands Code, for fiscal year July 1, 1975 to June 30, 1976, shall be $8,500,000.

Section 4. The estimated general fund revenues and contributions to be realized during the fiscal year July 1, 1975 to June 30, 1976 and to be drawn upon in funding Appropriation Bill Nos. 6762 (Legislature), 6763 (Interest Revenue Fund), 6764 (Executive Branch), 6765 (Municipal Court), and 6766 (College of the Virgin Islands), are as contained in Appendix I which is attached hereto and by this reference made a part of this Act.

■ Because we have determined that the Governor may, under section 9(d), veto parts of a bill if items of appropriations of money are included therein, with the evils that the item veto was designed to obliterate as discussed above in mind, and more particularly, because the so-called "no rider clause" had not been engrafted onto our basic law, we, on the authority of State v. Henry, supra, and Brown v. Ferguson, supra, hold that all of that language was properly carved out of the bill in question. Only by so holding can we assure our government of a reasonable system of checks and balances. The Legislature does not have the unfettered will to unite as many subjects in one bill as it may choose, if in the same bill several items of appropriation of money are found. Especially do we rely on State v. Henry, viewing the breadth of the grant of the executive power to this territory as co-extensive with that of the Governor of the State of Wisconsin, and we quote from the opinion in that case.

It may well be that [the constitution] was not intended to empower the Governor, in vetoing parts of an appropriation bill, to dissever or dismember a single piece of legislation which is not severable, or so as to leave merely provisions which are not a complete or fitting subject for a separate enactment by the Legislature. Although that may not have been intended, there is nothing in that provision which warrants the inference or conclusion that the Governor's power of partial veto was not intended to be as coextensive as the Legislature's power to join and enact separable pieces of legislation in an appropriation bill.

Id., at 492.

\* \* \*

Therefore, in order to check or prevent the evil consequences of improper joinder, so far, at least, as appropriation bills are concerned, it may well have been deemed necessary, in the interest of good government, to confer on the Governor, as was done by the amendment, . . . the right to pass independently on every separable piece of legislation in an appropriation bill.

* * *

Manifestly, if the parts vetoed had been approved, but thereafter held unconstitutional, there would have been no difficulty in considering them entirely eliminated as independent and separable provisions of the Act, and in upholding the remainder valid, as a complete law capable of being carried into effect, independently of the eliminated parts.

Id., at 493.

See also Dickenson v. Saiz, 308 P.2d 205 (N.M. 1957), where language also more properly relegated to general legislation was appended to appropriations, and the striking thereof was upheld as a valid exercise of the item veto power.

█ As to the instances in which we have held that the Governor exceeded his authority in the attempted item veto exercises, it is clear that the purported veto being a nullity, the parts or items said to have been vetoed became law. So vast is the authority for this that we feel no discussion is warranted. See, e.g., Sego v. Kirkpatrick, supra, at 987; Turner v. Iowa State Highway Commission, supra, at 151; Commonwealth v. Dodson, supra, at 134; In re Opinion of Justices, supra, at 791; Fulmore v. Lane, supra, at 412; State v. Holder, supra, at 645; State ex rel. Cason v. Bond, supra, at 393.

## THE IMPOUNDMENT DISPUTE

In Count II of their counterclaim, Defendants accuse the Chief Executive of unlawful impoundment of funds appropriated for the operation of the Legislature. This harks back to the Governor's item veto of certain language in Bill No. 6762 previously discussed. The spectre of impoundment, such as it is, stems from the portion of a message dated July 8, 1975, from the Governor to the Legislature in which he said

80

while the total appropriation of $2,309,214 must be approved as a lump sum to avoid hampering the entire legislation process, it should be clearly understood that no funding will be provided for the disapproved portions of this appropriation bill.

██ Rather summarily we dispose of this cause of action. Certainly it cannot be contended that funds appropriated for the Legislature enjoy so sacrosanct a status that they may not be reached by the proper exercise of the Governor's item veto power. Notwithstanding whatever may have been said in Dixon v. Shaw, 253 P. 500, 50 A.L.R. 1237 (Okla. 1927), Opinion of Justices, 96 A.2d 749 (Maine 1953) and State ex rel. Griffith v. Turner, 233 P. 510 (Kan. 1925), we hold as devoid of merit, the contention advanced by the Defendants that language other than that which we have held to have been properly vetoed by the Governor would authorize it to expend moneys from the total appropriation for its post audit division or on behalf of its Virgin Islands Delegate to the Congress. We do not suggest that the Governor may capriciously veto legislative appropriations. This we think the Governor himself recognizes, as is borne out by his solicitude for the Legislature in not desiring to, in any way, hamper the operation of that branch by reducing the total amount of its appropriation. In any event, impoundment of funds necessarily implies the existence of a lawful appropriation, that such funds are available, and that the Chief Executive has refused to release or expend them. Our holding that the Governor's item veto was valid deprives the impoundment claim of its underpinning and consequently compels dismissal of Count II of the counterclaim.

What remains of the issues between these parties are those which surface in Count II of Plaintiffs' complaint.

## SEPARATION OF POWERS

On June 27, 1975, the Legislature passed Bill No. 6784

and sent it to the Governor for approval. The bill was returned by the Governor disapproved on July 7, 1975, it being the view of the Governor that it constituted an impermissible encroachment by the Legislature on the functions reserved to the Executive department. In the manner provided by law, the Legislature overrode the Governor's veto on July 14, 1975, and upon return of the bill to the Governor it became Act No. 3718. Three sections of that Act are the ones principally charged as offensive. They are sections 2, 4 and 10.

Section 2 directs that within 15 days of the Governor's approval of Bill No. 6764, he submit details of proposed expenditures for the Department of Public Works, Education and Health to the Finance Committee of the Legislature for its "consideration". The bill then gives the Finance Committee 15 days after receipt of the proposed expenditures "to either approve said expenditures as proposed or to submit a report and accompanying legislation for approval by the Legislature which would amend said proposed expenditures." The failure of the Finance Committee to act within the 15-day period would cause the proposed expenditures to "be considered as approved by said Finance Committee". According to the section there were to be no restrictions on expenditures by the affected departments during the 15-day period in which the Finance Committee had the proposed expenditures under consideration.

Section 4 created an "Emergency Expenditure Fund" within the office of the Governor to be "utilized for meeting unforeseen financial emergencies of the Government." However, the money appropriated into that fund could not be spent "without the prior approval of the Governor and the Finance Committee of the Legislature."

Section 10 established another fund and in the process amended Chapter 111 of Title 33 of the Virgin Islands

Code. The fund here established was designated "Equipment Purchase Fund". From moneys thereto appropriated equipment for the operation of the various departments and agencies of the government was to be bought. The fund was to be administered by the Commissioner of Finance, purchases to be made on the recommendation of the Commissioner of Property & Procurement, provided he obtain the "prior approval of the Governor and the Finance Committee of the Legislature."

In essence, the contention of Plaintiffs is that insofar as the sections detailed above are concerned, Bill No. 6784 is in direct violation of the doctrine of separation of powers. Defendants it seems would make light of that doctrine, according it only passing significance, but that it is firmly rooted in the system of government which the Congress has provided for this territory is made clear by Municipality of St. Thomas & St. John v. Gordon, 78 F.Supp. 440 (D.C.V.I. 1948). That Virgin Islands decision, following Springer v. Philippines, 227 U.S. 189 (1928), by two decades has, we believe, firmly laid that matter to rest.

It may be stated, then, as a general rule inherent in the American constitutional system that unless otherwise expressly provided or incidental to the powers conferred, the Legislature cannot exercise executive or judicial power.

Springer, supra, at p. 201.

█ It follows, then, that unless we find explicit authorization by the Congress within the corners of the Revised Organic Act or discern, arguably, that such power falls within the scope of, and is incidental to the legislative function, the scheme devised under sections 2, 4 and 10 of Act No. 3718 cannot be permitted to stand. Finding no such authorization, explicit or otherwise, we hold that the three sections of the Act illicitly trespass on the executive preserve.

The argument of the Defendants, that this control is needed to enable them to intelligently legislate and amend legislation once enacted, is not the least persuasive. Neither do we regard the two cases chiefly relied on by Defendants to be of any controlling influence. Whatever the holding in Opinion of the Justices, 226 A.2d 823 (N.H. 1970), it directly results from that state's peculiar, in the sense that they are different, constitutional provisions and laws. The other case, Opinion of the Justices, 13 So.2d 674 (Ala. 1943), we do not agree with even on its facts. The position there taken by the court was that the legislators were acting not qua legislators but rather as members of a board which had been legislatively set up. In the cause sub judice, on the other hand, the Finance Committee as a standing committee of the Legislature would be acting purely and solely in its legislative capacity and no other.

For us the lead to follow is that set by the court in State ex rel. Myer v. State Board of Equalization and Assessment, 176 N.W.2d 920 (Neb. 1970).

... the control of the purse strings of government is a legislative function. Indeed, it is a supreme legislative prerogative, indispensable to the independence and integrity of the Legislature, and not to be surrendered or abridged save by the Constitution itself.

Id., at p. 925. Going on, however, the court took cognizance of the fact that there are limits to that wide expanse of legislative authority.

The Legislature has plenary or absolute power over appropriations. It may make them upon such conditions and with such restrictions as it pleases within constitutional limits. There is one thing, however, which it cannot do, and this is inherent in Article II, section 1, Constitution of Nebraska [embracing the doctrine of separation of powers]. It cannot through the power of appropriation exercise or invade the constitutional rights and powers of the executive branch of the government. It cannot administer the appropriation once it has been made. When the appropriation is

made, its work is complete and the executive authority takes over to administer the appropriation to accomplish this purpose, subject to the limitations imposed.

Id., at p. 926.

In the case before us, the fact that approval of the Finance Committee is either expressly ordained, or by implication calculated, suffices to command the declaration of a violation of our basic law for which the Plaintiffs contend. As the Springer court put it:

Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions.

\* \* \*

. . . the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection. . . .

\* \* \*

. . . it is clear that they [duties which the legislature had attempted to devolve upon certain of its members] are not legislative in character, and still more clear that they are not judicial. The fact that they do not fall within the authority of either of these two constitutes logical ground for concluding that they do fall within that of the remaining one of the three among which the powers of government are divided.

This Court cannot do other than stand in the way of these attempted intrusions into the executive province.[9] To exercise the control of appropriations of these executive departments which the act envisages is tantamount to control of each of those departments. The

___

[9] The Legislature of the Virgin Islands seems to enjoy company of the highest standing in its attempt to insert a legislative finger in the executive pie. Recently the Supreme Court of the United States has had occasion to turn back an attempt at the same venture by The Congress, albeit in a different context. See Buckley, et al. v. Valeo, et al., — U.S. — (Decided January 30, 1976). Lamentably, there seem to be additional, and equally futile attempts in the offing, at home and abroad.

contention that disapproval by the Finance Committee is without legal effect has no merit. With the power both to delay and recommend, the capacity for control is present. Those sections which purport to give the Governor a say in the running of executive departments, jointly with the Finance Committee, signal violations of the Revised Organic Act in a fashion that is manifest. Given the separate powers of each of the two branches of government heretofore thought to have been divided by clean and distinct lines of demarcation, both branches cannot be said to have and to exercise control over, and approval of, executive expenditures. I see no law-making function involved in this grant of power to the Finance Committee. I perceive only an advance well beyond that committee's scope. Accordingly, the prayers of Count II of the complaint will be granted.

The court wishes to acknowledge the helpful participation of amicus curiae, The League of Women Voters, and its counsel in briefing the second cause of action of the complaint. Our grateful thanks go out to amicus for its invaluable aid. We heartily congratulate, and highly commend The League for its civic-mindedness, and express the fervent hope that the capital example it has set, the first in my experience as practitioner and judge, will prompt other organizations to involve themselves before the Court in matters of pressing public concern.